STATE OF NORTH CAROLINA v. DOUGLAS EARL BLACK

No. 568A88

(Filed 7 February 1991)

1. **Jury § 6 (NCI3d)— jury selection—statement by one prospective juror—motion to dismiss all prospective jurors denied**

The trial court did not err in a prosecution arising from a murder, armed robbery, and assault by denying defendant's motion to dismiss all prospective jurors who had heard one juror say "my wife and my child were assaulted by a black man with a deadly weapon" when asked if he would hold the State to its burden of proof. The prospective juror's statement did not give rise to a substantial reason to fear that the jury had been prejudiced because the prospective juror made no reference to any particular black male or to defendant. The prospective jurors must have known that there are many black males in North Carolina and that some of them commit assaults, as do members of all racial groups; moreover, defendant expressed satisfaction with each juror ultimately selected and did not exhaust his peremptory challenges.

Am Jur 2d, Jury §§ 229, 241, 284, 287.

2. **Criminal Law § 913 (NCI4th)— motion to poll jury—jury dispersed—motion untimely**

The trial court did not err in a prosecution for murder, robbery, and assault by denying defendant's motion to poll the jury after guilty verdicts had been returned and the jury was given a thirty-minute break before the sentencing proceeding. The motion to poll the jury must be made before the jury is dispersed; the jury here was dispersed within the meaning of N.C.G.S. § 15A-1238 because the members of the jury were exposed during the thirty-minute break to influences extraneous to the deliberations of the entire jury as a body.

Am Jur 2d, Trial § 1125.

Accused's right to poll of jury. 49 ALR2d 619.

3. **Robbery § 4.3 (NCI3d); Homicide § 21.6 (NCI3d); Assault and Battery § 26 (NCI4th)— evidence of identification—sufficient**

The State presented substantial evidence that defendant was one of the perpetrators of the crimes charged where de-

STATE v. BLACK

[328 N.C. 191 (1991)]

fendant was charged with first degree murder, armed robbery, conspiracy to commit armed robbery, and assault with a deadly weapon with intent to kill inflicting serious injury and the State introduced evidence tending to show that defendant told Gail Isom that he and Mack Lee Nichols had talked about robbing the victim, Pete Collins, because Collins carried a large amount of cash in a briefcase; the defendant and Isom cased Collins' store two times shortly before the killing; they saw Collins leave the store with a briefcase in his hand on one occasion; defendant convinced Isom to buy a shotgun for him a week before the killing; defendant was a tall, thin, light-complexioned black man who owned a tan London Fog-type raincoat; witnesses saw Mack Lee Nichols walking toward Collins' store with a tall, thin, light-complexioned black man wearing a tan London Fog-type raincoat a few minutes before the robbery and murder; witnesses in the store at the time of the murder stated that a tall, thin, light-complexioned black man wearing a tan, London Fog-type raincoat was one of the two men who entered the store firing weapons; the perpetrators took Collins' briefcase full of money, shot the attending clerk, and shot and killed Collins; defendant left Raleigh the day after the murder and went to Rhode Island with a friend; and the evidence tended to show that three $50 bills given to a friend by defendant came from Pete Collins.

Am Jur 2d, Homicide §§ 286, 435; Robbery § 64.

4. **Criminal Law § 557 (NCI4th)— reference to prior drug dealing—mistrial denied—no abuse of discretion**

The trial court did not abuse its discretion in a prosecution for murder, robbery, and assault by denying defendant's motion for a mistrial where a detective read from a witness's recorded statement which indicated that defendant had been involved in drugs in the past, even though his prior motion in limine to forbid evidence of his prior drug dealings had been granted. The trial court sustained defendant's objection and instructed the jury to disregard the evidence.

Am Jur 2d, Evidence § 320; Trial § 1107.

5. **Criminal Law § 794 (NCI4th)— felonious assault—acting in concert—evidence sufficient for instruction**

There was no plain error in a prosecution for assault, murder, and robbery in giving the jury an instruction to the

effect that defendant could be convicted of felonious assault upon a theory of acting in concert where there was evidence tending to show that defendant and another planned to commit the robbery with firearms; each of them entered the store with a firearm in his hands and several shots were fired; and one shot struck the victim, causing him serious injury.

**Am Jur 2d, Assault and Battery § 11.**

APPEAL of right by the defendant, pursuant to N.C.G.S. § 7A-27(a), from a judgment imposing a sentence of life imprisonment entered by *Herring, J.,* on 26 July 1988 in Superior Court, WAKE County. On 26 October 1989, the Supreme Court allowed the defendant's motion to bypass the Court of Appeals on his appeal from additional judgments imposing sentences of less than life imprisonment. Heard in the Supreme Court on 13 November 1990.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant was tried upon proper bills of indictment charging him with first degree murder, armed robbery, conspiracy to commit armed robbery, and assault with a deadly weapon with intent to kill inflicting serious injury. He was tried in the manner prescribed for capital cases. The jury found the defendant guilty of first degree murder on a felony murder theory. The jury also found the defendant guilty of armed robbery, conspiracy to commit armed robbery, and assault with a deadly weapon inflicting serious injury. After a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment for the murder conviction. The trial court thereafter entered judgments imposing a sentence of life imprisonment for the murder conviction, a ten-year sentence for the conspiracy conviction and a ten-year sentence for the assault conviction. The trial court arrested judgment on the conviction for the armed robbery, as it formed the predicate felony for the first degree murder conviction under the felony murder theory.

STATE v. BLACK

[328 N.C. 191 (1991)]

The State's evidence tended to show that on 29 January 1985, two men entered Capital Variety and Video Store in Raleigh where they robbed and killed Roy Leonzia "Pete" Collins. Witnesses for the State testified that at approximately 8:00 p.m. on 29 January 1985, a total of seven people were in the store. A male employee, Gregory Council, was behind the counter. Collins, the owner of the store, was in a back office with his thirteen-year-old nephew. The door of the store flew open, and two men were standing in the doorway. One was a stocky black man wearing a green army jacket and carrying a pump-action shotgun. The second man was a thinner black man with a lighter complexion who was wearing a tan "London Fog-type" raincoat and holding a rifle. They yelled "freeze" and began shooting. Gregory Council felt something hit him in the side, and he spun around and fell to the floor. Shots were being fired by Collins from the office part of the store and by the two perpetrators from the front of the store. One of the perpetrators shouted to Collins to "put it down." Collins threw the gun in his hands to the floor.

The stocky man in the green army jacket came into the office and walked to within a few feet of Collins. He asked, "How you doing, Pete?" and fired one shot into Collins' abdomen. The perpetrators took a briefcase containing more than $30,000 in cash from Collins' hand. The man in the army jacket yelled, "Pick up the shells man. Pick up the shells." The man in the tan raincoat got down on the floor in the front part of the store and picked up shells before the two perpetrators left the store.

Collins died that evening from massive internal bleeding resulting from the gunshot wound to his abdomen. Council was required to undergo two operations to repair a punctured lung and other internal injuries resulting from the gunshot wound to his side.

James Cooley testified that he saw a black man in a tan "London Fog-type" coat and another man in a green army jacket whom he identified as Mack Lee Nichols heading in the direction of Collins' store immediately before Collins was killed.

Alvin Banks testified that the defendant and Nichols visited him on two occasions shortly before Collins was killed. On both occasions, the defendant was present when Nichols talked about a plan to rob and, if necessary, kill Pete Collins. The defendant and Nichols discussed using a shotgun during the course of a rob-

bery. When the defendant said that he did not know how to use a shotgun, Nichols told him that he would show him.

Dani Gail Isom, the defendant's former girlfriend, testified that a week before the robbery, she purchased a shotgun for the defendant at his request. She also testified that the defendant had told her that he and Nichols had talked about robbing Collins. In addition, Isom testified that she and the defendant "cased" Collins' video store on two different occasions prior to the robbery and killing.

The State's evidence also tended to show that the defendant went to the home of Dwight Douglas Allen three hours after the robbery and murder of Collins. The defendant told Allen that he wanted to go to Rhode Island the next day, 30 January 1985. The defendant gave Allen three $100 bills and told him to rent a car for that purpose. The following day, the defendant and Allen drove to Providence, Rhode Island. While they were in Providence, Allen's girlfriend called to tell him about the murder of Pete Collins. When Allen asked the defendant if he had anything to do with Collins' murder, the defendant responded, "If I don't tell you nothing, you won't know nothing." When Allen returned to Raleigh, the defendant did not come with him.

Upon Allen's return to Raleigh, the police questioned him about the defendant. Allen gave the police four $50 bills that the defendant had given him. Three of the bills had writing on them and bore the odor of cologne. The writing on the bills was identified as Collins' writing by Jackie Humphries, Collins' bookkeeper. She also identified the cologne on the bills as the cologne that Collins put on each bundle of bills in his briefcase.

The defendant was arrested on 12 May 1987 in Florence, Kentucky, on a warrant for unlawful flight to avoid prosecution. Thereafter, he was returned to North Carolina for trial on the charges giving rise to this appeal.

The defendant offered no evidence at trial.

[1] The defendant first assigns as error the trial court's failure to inquire into whether prospective jurors were prejudiced as a result of a statement by one prospective juror. After the first twelve prospective jurors were brought into the jury box, one of them, a Mr. McLean, was being questioned by the prosecutor. When asked if he would hold the State to its burden of proof, he said, "my wife and my child were assaulted by a black man

with a deadly weapon." The remainder of his answer was cut off by an objection by the defendant's counsel. The other prospective jurors were then excused from the courtroom, while McLean remained for further questioning. He was then excused on the joint motion of the defendant and the prosecutor. Thereafter, the trial court denied the defendant's motion to dismiss all of the prospective jurors who had heard McLean's statement. In denying the motion the trial court concluded that "the statement was not sufficient to inflame or prejudice the entire panel or taint the panel so as to prevent them from being fair as prospective jurors." Five members of the jury that actually served and rendered verdicts in the defendant's trial were present when prospective juror McLean made the statement. The defendant's counsel did not request that the jury be questioned about the statement.

When there is substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial. *State v. Barts*, 316 N.C. 666, 683, 343 S.E.2d 828, 839 (1986). The trial court "has the duty to supervise the examination of prospective jurors and to decide all questions relating to their competency." *State v. Young*, 287 N.C. 377, 387, 214 S.E.2d 763, 771 (1975). It also has broad discretion "to see that a competent, fair and impartial jury is impaneled and rulings in this regard will not be reversed absent a showing of abuse of discretion." *State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979); *accord State v. Phillips*, 300 N.C. 678, 268 S.E.2d 452 (1980).

In the case *sub judice*, the prospective juror's statement did not give rise to a substantial reason to fear that the jury had been prejudiced. The prospective juror made no reference to any particular black male or to the defendant. All of the prospective jurors must have known that there are many black males in North Carolina and that some of them — like some members of all other racial groups — commit assaults. The mere fact that the prospective juror referred to an assault committed by a black male, combined with the fact that the defendant was a black male, did not present the trial court with any substantial reason to fear that other prospective jurors who heard the statement would be prejudiced against the defendant. If such was the case, it would be difficult or impossible to assemble a jury given the fact that most jurors have been exposed to information about crimes committed by members of

all races in our society. Everyone is exposed to such information by reading newspapers, watching television, and through everyday life experiences. There simply is no merit to the defendant's contention that prospective juror McLean's statement, without more, required the trial court to conduct any special inquiry into possible jury prejudice. Our conclusion in this regard finds additional support in the fact that the defendant expressed satisfaction with each juror ultimately selected and the fact that the defendant did not exhaust the fourteen peremptory challenges permitted him under N.C.G.S. § 15A-1217(a)(1). *See State v. Artis,* 316 N.C. 507, 511, 342 S.E.2d 847, 850 (1986) (defendant's satisfaction with jury); *cf. State v. Quesinberry,* 319 N.C. 228, 235, 354 S.E.2d 446, 450 (1987) (failure to exhaust peremptory challenges). This assignment of error is without merit.

[2] By his next assignment of error, the defendant contends the trial court erred in denying his motion to poll the jury after the guilty verdicts had been returned and the jury had been given a thirty-minute break. In the present case, the guilty verdicts on all charges were received by the trial court at 12:05 p.m. The jury was then given a thirty-minute recess and instructed not to discuss this case among themselves or with any other persons. After the jury left the courtroom, the trial court asked the attorneys, "Gentlemen, is there any point you would care to raise at this point?" The defendant made no motion to poll the jury at that time. After a short discussion about the possible merger of two of the verdicts, the trial court again inquired, "Is there any other matter you gentlemen care to raise at this point?" Again, the defendant made no motion to poll the jury; instead, he requested five minutes before responding to the judge's inquiry. The trial court then discussed the sentencing proceeding to be held and granted a fifteen-minute recess. At 12:33 p.m., after the recess and while the jury was still on its break, the defendant moved that the jury be polled. The trial court denied the motion, stating the motion came too late.

The right to a poll of the jury in criminal actions is firmly established by Article I, Section 24 of the Constitution of North Carolina and by statute.

Upon the motion of any party made after a verdict has been returned and *before the jury has dispersed,* the jury must be polled. The judge may also upon his own motion require

the polling of the jury. The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict. If upon the poll there is not unanimous concurrence, the jury must be directed to retire for further deliberations.

N.C.G.S. § 15A-1238 (1988) (emphasis added).

The purpose of polling the jury is to ensure that the jurors unanimously agree with and consent to the verdict at the time it is rendered. *Lipscomb v. Cox*, 195 N.C. 502, 142 S.E. 779 (1928). If the jury is unanimous at the time the verdict is returned, the fact that some of them change their minds at any time thereafter is of no consequence; the verdict rendered remains valid and must be upheld. *Id.* The rationale behind requiring that any polling of the jury be before dispersal is to ensure that nothing extraneous to the jury's deliberations can cause any of the jurors to change their minds. *Id.* Once a juror leaves the courtroom after the verdict is returned and goes into the streets, despite her best efforts to shield herself, she still can be affected by improper outside influences. At that point, such improper outside influences may take the form of things the juror sees or hears or may be limited to the juror's own weighing of the evidence and the law independently and in the absence of other members of the jury. In other words, once the jury is dispersed after rendering its verdict and later called back, it is not the same jury that rendered the verdict.

In the case *sub judice*, when the trial court gave the jury a thirty-minute break, the jury was free to leave the courtroom and go into the streets. During that thirty-minute period, the members of the jury were exposed to influences extraneous to the deliberations of the entire jury as a body. Hence, the jury had been "dispersed" within the meaning of N.C.G.S. § 15A-1238, and the motion to poll the jury came too late. Consequently, the defendant waived the right to poll the jury. This assignment of error is without merit.

[3] The defendant next assigns as error the trial court's denial of his motion to dismiss all charges against him on grounds of insufficiency of the evidence. In support of this assignment, the defendant argues that there was no substantial evidence tending to identify him as one of the perpetrators of the crimes charged.

A guilty verdict will be upheld if the State presents substantial evidence of each element of the offense charged. *State v. Mercer*, 317 N.C. 87, 343 S.E.2d 885 (1986); *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The test of sufficiency of the evidence is the same whether the evidence is direct, circumstantial or both. *Id.* When ruling on a motion to dismiss in a criminal case the trial court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference. *Id.* Any contradictions or discrepancies are for resolution by the jury. *Id.*

Contrary to the defendant's argument in support of this assignment, the State presented substantial evidence that the defendant was one of the perpetrators of the crimes charged. The State introduced evidence tending to show that the defendant told Gail Isom that he and Mack Lee Nichols had talked about robbing Pete Collins because he carried a large amount of cash in a briefcase. Two times shortly before the killing, the defendant and Isom "cased" Collins' store. On one occasion they saw Collins leave the store with a briefcase in his hand. A week before the killing, the defendant convinced Isom to buy a shotgun for him. In addition, the defendant was a tall, thin, light complexioned black man who owned a tan London Fog-type raincoat. A few minutes before the robbery and murder, witnesses saw Mack Lee Nichols walking toward Collins' store with a tall, thin, light complexioned black man who was wearing a tan London Fog-type raincoat. The witnesses in the store at the time of the murder stated that a tall, thin, light complexioned black man wearing a tan London Fog-type raincoat was one of the two men who entered the store firing weapons. The perpetrators took Collins' briefcase full of money, shot the attending clerk and shot and killed Collins. The defendant left Raleigh the day after the murder and went to Rhode Island with a friend. The State's evidence also tended to show that three $50 bills given to a friend by defendant came from Pete Collins, because the bills bore Collins' markings and cologne. Taken as a whole, such evidence constitutes substantial evidence that the defendant was one of the perpetrators of the crimes charged. This assignment of error is without merit.

[4] The defendant next contends the trial court erred in failing to declare a mistrial when a detective read from a recorded statement of Gail Isom, part of which indicated that the defendant

had been involved with drugs in the past. Whether a motion for mistrial should be granted is a matter which rests within the sound discretion of the trial court, and a mistrial is appropriate only when there are such serious improprieties as would make it impossible to achieve a fair and impartial verdict under the law. *State v. Calloway*, 305 N.C. 747, 754, 291 S.E.2d 622, 627 (1982).

In the case *sub judice*, before Isom's statement was read, the trial court had granted the defendant's motion *in limine* and forbidden any evidence concerning the defendant's prior drug dealings. Even so, Isom's statement as read by the detective included the remark that, "I knew that he [the defendant] had, you know, drug involvement in the past." The defendant objected and his objection was sustained. The trial court then instructed the jury to disregard the statement. When the trial court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured. *See State v. Walker*, 319 N.C. 651, 655, 356 S.E.2d 344, 346 (1987). The trial court did not abuse its discretion by denying the defendant's motion for a mistrial. There is no merit to this assignment of error.

[5] By his final assignment of error, the defendant contends the trial court erred in giving a jury instruction to the effect that the defendant could be convicted of the felonious assault on Gregory Council upon a theory of acting in concert. In support of this assignment, the defendant argues that there was insufficient evidence to support such an instruction. However, since the defendant failed to object to the instruction, we find that the defendant waived any error in this regard. *State v. Oliver*, 309 N.C. 326, 334, 307 S.E.2d 304, 311 (1983); N.C.R. App. P. 10. Therefore, our review is limited to review for "plain error." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

We have emphasized that:

[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,"* or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the

fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (*quoting with approval United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982) ). Before deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986). In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to convict the defendant. *Id.*

In the case *sub judice*, our review of the whole record in light of this assignment reveals no error and certainly no "plain error." In order to convict a defendant under a theory of acting in concert, it is not necessary that the defendant personally commit all the acts required to constitute the crime charged. When two or more persons act together with the common purpose to commit robbery, each is held responsible for the acts of the other done in the commission of the robbery. *State v. Harris*, 315 N.C. 556, 563, 340 S.E.2d 383, 388 (1986). Here, there was evidence tending to show that the defendant and Mack Lee Nichols planned to commit the robbery and to do so with firearms. The evidence also tended to show that each of them entered the store with a firearm in his hands and several shots were fired. One shot struck Council causing him serious injury. No more was required to justify the jury instruction on acting in concert which the defendant now contends was plain error. This assignment is without merit.

For the foregoing reasons, we conclude that the defendant received a fair trial free from prejudicial error.

No error.